IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. MOHAMMED

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

TARIK A. MOHAMMED, APPELLANT.

Filed May 15, 2018.    No. A-17-447.

Appeal from the District Court for Lancaster County: JODI L. NELSON, Judge. Affirmed.

Sanford J. Pollack, of Pollack & Ball, L.L.C., for appellant.

Douglas J. Peterson, Attorney General, and Kimberly A. Klein for appellee.

RIEDMANN, BISHOP, and WELCH, Judges.

BISHOP, Judge.

## INTRODUCTION

Tarik A. Mohammed appeals his convictions of two counts of third degree sexual assault of a child following a jury trial in the district court for Lancaster County. Mohammed assigns error to the court's rulings admitting evidence of prior sexual assaults and prior physical assaults or bad acts. Mohammed also claims there was insufficient evidence to support his convictions and that the court imposed excessive sentences. We affirm.

## BACKGROUND

The record in this case recounts events involving four sisters that occurred over the span of a decade in Iraq, Syria, and the United States. The four sisters also had brothers, but they are not relevant to this appeal. The mother of these children married Mohammed in Baghdad, Iraq, sometime around 2004, making him the stepfather of her children. After moving from Iraq to Syria, the family was relocated to the United States in 2009. They initially lived in Phoenix, Arizona, but

moved to Lincoln, Nebraska, in 2011. In 2013, some of the family returned to Phoenix for "maybe one year," then they spent a month in Maine, moved back to Lincoln for 2 months, returned to Phoenix for a while, and eventually settled back in Lincoln in either 2014 or 2015.

Mohammed subjected his four stepdaughters to varying degrees of sexual assault beginning in Iraq, and the sexual assaults continued after their move to the United States. The testimony of the stepdaughters at trial, discussed in greater detail below, was that they were unable or unwilling to report these occurrences because of threats made by Mohammed and for other cultural reasons. The few attempts they made to tell their mother were not successful. They did not become aware he had sexually assaulted all of them until the night of October 31, 2015.

On October 31, 2015, the sisters were at the oldest sister's home. The oldest sister, S.A., was 30 years old at this time. The youngest sister, F.A., divulged to the oldest sister that Mohammed had previously "touched" her. F.A. was 14 years old at the time. Another sister, A.A. (age 17), heard this and likewise admitted that Mohammed had done the same to her. The younger sisters talked about clothes being removed and being touched by Mohammed in different places on their body. R.A. (age 26), also nearby, subsequently disclosed that she too had been sexually assaulted by Mohammed. The two older sisters told their mother about Mohammed's actions, and their mother allowed them to call the police that night. The police were called to the oldest sister's residence, at which time the sisters disclosed some of the details of the sexual assaults. The two younger sisters were interviewed further on November 3, and they were eventually removed from the parental home through a juvenile court proceeding. Mohammed was interviewed by a police investigator on November 17, and he denied the sexual assault allegations.

Mohammed was charged on August 25, 2016, with two counts of third degree sexual assault of a child. Both counts alleged that he was over 19 years of age and subjected a person 14 years of age or younger to sexual contact. Count 1 alleged he had subjected A.A. to sexual contact between January 1, 2012, and September 13, 2013. Count 2 alleged he had subjected F.A. to sexual contact between August 1, 2011, and May 31, 2012.

On November 7, 2016, Mohammed filed a motion for disclosure of any evidence of other crimes or bad acts the State intended to offer under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Reissue 2016), and on the same day, the State filed a notice of intent to offer evidence of defendant's commission of other sexual assault offenses under Neb. Evid. R. 414, Neb. Rev. Stat. § 27-414 (Reissue 2016). An evidentiary hearing was held on November 16, 2016, regarding the admissibility of any evidence proposed by the State to be admitted under either rule 414 or rule 404. The sisters testified about the alleged incidents for which Mohammed was charged, as well as several other alleged sexual and physical assaults occurring in Iraq, Syria, Arizona, and Nebraska. The court entered an order on December 2, finding that the testimonies regarding the previous sexual and physical assaults were admissible at trial under rule 414, or as being inextricably intertwined with the evidence of sexual abuse, or as evidence of other crimes, wrongs, or acts as provided in rule 404.

A jury trial commenced on February 6, 2017, and ended on February 10. Each of Mohammed's four stepdaughters testified for the State, along with an investigator with the Lincoln Police Department, who briefly testified about having the two younger sisters go through forensic interviews. He also acknowledged that Mohammed appeared voluntarily for an interview at the

police station, where Mohammed denied all allegations of any type of sexual abuse of his stepdaughters. The sisters testified as follows.

*Testimony of F.A.*

The youngest sister, F.A., age 16 at trial, recounted multiple incidents of Mohammed inappropriately touching her. The first incident took place in Syria, when she was between the ages of 4 and 6. She and Mohammed were laying on the floor sleeping when Mohammed moved closer to her and started touching her chest both over and under her shirt. She tried to move away from him, but that did not stop him. She could not remember if anyone else was in the house at the time.

A second incident occurred in Lincoln when she was in the 5th grade and was between the ages of 10 and 11. Mohammed called her to his bedroom to read an email for him while he was lying on the bed. She was standing next to him reading the email and he started touching her back and then began touching her chest. He then pulled her onto the bed, held her down, and took off her shirt. He put his hand over her mouth as she was trying to move. He touched her chest with both the shirt on and off, and eventually he touched her vagina. F.A. tried to move Mohammed's hand, and then bit it and screamed. A.A. then came and knocked on the door; Mohammed got up and told F.A. to get dressed and she then left. The incident lasted about 10 minutes and F.A. did not remember where her mother was when this occurred.

Another incident occurred when F.A. was in the 5th grade. Mohammed was staying in a hotel because he was fighting with her mother. Mohammed told her mother he needed two of the children to stay with him because there was a woman "looking at him in a weird way." F.A. ended up going with Mohammed to the hotel, along with her niece, although F.A. did not want to go. F.A. woke up in the middle of the night and Mohammed was on top of her, and her "knees were bent up." They were both naked though she had gone to bed wearing clothes. Mohammed had one hand on her knee while he was "holding his private parts" with his other hand. She moved away immediately and he left and went into the bathroom while she got dressed.

On another occasion when she was in the 5th grade, F.A. was taking a shower with her niece, and Mohammed came and knocked on the door and stated he needed to use the bathroom. She told him multiple times she was showering and would be out soon, but he claimed he could not wait any longer. Mohammed persisted and she finally got out of the shower and unlocked the door; she then went back into the shower, closing the curtains from both sides. However, after Mohammed had finished using the bathroom, he attempted to open the curtains and look at her. She attempted to block him, but he continued to try to open the curtains to look at her. She screamed but did not think anyone heard her, and Mohammed left after that.

F.A. stated she was too scared to tell anyone about these incidents when they occurred. Mohammed told her not to tell anybody, and had threatened to "kick her out" and send her back to Iraq. She stated if somebody found out what Mohammed had done to her, it would "be a shame to the family. And that means that they have to kill me." She also stated she was scared of Mohammed hitting her because he had previously hit her, her sisters, and her nieces and nephews in order to discipline them. She testified regarding a specific incident when he had hit her while they lived in Arizona. Mohammed had her read the mail for him, which she did, but he was not paying attention so he told her to read it over again. She protested, and he grabbed her by the hair and told her that she should listen. Her mother intervened and she eventually got away, but he then

pushed her onto the couch. Mohammed told her to be quiet because she was screaming and crying, but when she continued, he punched her on the nose. When asked on direct examination "Were these threats and violent incidents the reason that you hadn't told anybody up until October 31st of 2015?" F.A. responded, "Yes."

*Testimony of A.A.*

A.A., age 18 at trial, testified that Mohammed inappropriately touched her on multiple occasions. The first incident occurred when she was between the ages of 9 or 10, while the family was living in Syria. Mohammed touched her vagina over her clothes with his hand, though at the time she did not really understand why he touched her like that. She attempted to tell her mother when Mohammed was present, but they laughed and did not take her story seriously. Mohammed later told her that she was not supposed to tell her mother that "kind of stuff."

Another incident occurred on the day of her 14th birthday party in Lincoln. She stated she could not remember the exact date of the party, and that it might not have been on her actual birthday. She showered in the morning, and then returned to her room wearing a towel. Mohammed knocked on the bedroom door, which scared her because she thought she was home alone. She opened the door and he grabbed her, causing the towel to fall off. He then touched her right breast with his hand, and was telling her how she was "growing up" and how she "looked so cute." She yelled and pushed him, but he did not want to leave and was trying to grab her. A.A. was able to push him out the door, and then locked the door and got dressed. She went looking for her mother, but she was not there. A.A. did not tell anyone about this incident because she was scared. When she told Mohammed she was going to tell her mother about the incident, he threatened to kick her out of the house. She told him she would tell "somebody else," and he then threatened to send her back to Iraq, which scared her. She stated that in her culture, she would be blamed for the way Mohammed touched her, and in Iraq girls could be killed for telling someone about it. She would be blamed even if the touching was not something she wanted. A.A. said that after her 14th birthday, Mohammed repeatedly asked her to have sex with him in exchange for anything she would ask her mother for, like clothes, a phone, or "to go somewhere."

A.A. also stated that when she was about 16 years old, Mohammed touched her breasts while they were driving in a car in Lincoln. She yelled at him and hit his hand away. Mohammed told her it was an accident. A.A. stopped talking to Mohammed after she was 16 years old because "he made me feel disgust." Every time she said she wanted something, Mohammed would tell her, "I will do it if you will have sex with me."

A.A. said she was afraid of Mohammed. When asked if Mohammed physically abused her, she replied he hit her "a lot, like, over anything." He would hit her and her sisters with either an open or a closed fist, in the hands, chest, and face. She described a specific incident in Phoenix when her mother had traveled to Iraq. She and F.A. woke Mohammed up to ask him to take them to school. Mohammed was angry they had awakened him, and started yelling and hitting them. They had bruises as a result, and Mohammed told them he would kick them out of the house if they told anyone he had hit them.

*Testimony of S.A.*

The oldest sister, S.A., age 31 at trial, testified Mohammed raped her on multiple occasions. She stated Mohammed raped her the first time sometime between 2006 and 2007 in Iraq. She was staying with her mother and Mohammed for a few months because she was having problems with her husband at the time. Mohammed asked her to bring him some food or water when he was upstairs. She asked why he could not come downstairs and get it himself, and he told her he wanted to talk to her about something. She went into the room he was in, and he shut the door. Mohammed pushed her down, and she hit her head on the wall and she felt "foggy." She tried to stop him but he was stronger than her and raped her.

Mohammed raped her a second time while they were still in Iraq when she was again staying with her mother and Mohammed. Mohammed told her if she told anyone he would tell her husband and her older brother and they would kill her. She reported the rape to her mother, but her mother did not believe her. She stated that talking about sex is difficult in her culture and she could not report the rape to the police because they would not believe her. She could not tell her husband because he would kill her. She stated she was afraid of Mohammed, and feared for her family and what he would do to them.

She testified there was a third incident, in Syria, where Mohammed attempted to rape her again. However, on that occasion she was able to stop him and he was only able to touch her breasts.

After moving to the United States, S.A. remembered telling her mother how S.A. noticed Mohammed looking at F.A.'s "chest or her breasts" multiple times. She told her mother Mohammed looked at the girls "not like the father"; rather, he had a "different look for them."

*Testimony of R.A.*

R.A., age 28 at trial, testified through an interpreter about her experiences with Mohammed. The first incident occurred in Iraq in 2005 when she was 16 years old. She was asleep and had her cellphone tucked inside her shirt by her chest. Mohammed took it out from under her shirt, touching her breast in the process. R.A. told her mother that "her husband" is "no good." Mohammed made up a story that he found R.A.'s fiancé in her room, and this made her mother so angry she hit R.A.

The second incident took place when Mohammed sent her mother away to Baghdad. R.A. was asleep and she woke up to Mohammed lying next to her in his underwear and T-shirt, holding her with his arms around her and touching her breasts under her shirt. She ran out of the room and he came to her and told her that if she told her mother, he would tell her mother that he saw someone else inside her bedroom with her. She did not tell anyone prior to October 31, 2015, because, "It's something unspoken of; it's not something you can talk about."

The third incident occurred in Iraq in 2006 when she was 17; R.A. said Mohammed "raped me" and at that time she was "still a virgin." Her mother was not home, and R.A. was having kidney pain. Mohammed gave her pills for pain, but they were too strong for her and made her feel drowsy, so she went to the bedroom. She woke up and found Mohammed on top of her and "there was blood in my clothes." R.A. was crying and told Mohammed she was going to tell her mother what happened. He told her she can tell her, but "she's never going to believe you" and he would tell her there was another man in the room with R.A.

R.A. was afraid of Mohammed. Mohammed was very controlling of the family and especially of her mother. She had witnessed him hit her mother frequently, as well as her younger siblings, and he attempted to hit her once. After they moved to Syria, Mohammed attempted multiple times to touch her inappropriately or harass her, but she would run away from him and go to her room and lock the door. She never talked to her sisters about the details of their assaults "because it's a shame for us. It's something we can't talk about." She stated the police would not do anything to help her in Iraq, and would instead accuse her "of what happened." She also stated if anyone found out what had happened, members of her extended family would "accuse [her] of being a . . . bad woman or a bad girl" and kill her; this happened "[a] lot" in Iraq.

After moving to Lincoln and after R.A. got married, she and her husband had arguments and separated. Mohammed "came to me and he asked me if I can bear his child because this was an opportunity for him" since her husband was not with her. He asked her this "[m]any times." R.A. refused, and when she and her husband got back together, Mohammed decided to "kick [her] out of the house."

On the evening of October 31, 2015, after R.A. learned about what Mohammed was doing with her younger sisters, Mohammed called her around midnight. Mohammed was angry and yelled at her. R.A. told him, "[W]hat you did to me you can not . . . do it to my younger sisters." She was very angry and her body was shaking as she spoke to him. She told him, "[W]hen you did the things you did to us, there was nobody to support us . . . . We were alone. But . . . my sisters, they have us to protect them. And they have the law to protect them here." Mohammed started cussing at her, and her mother took the phone from Mohammed. R.A. went over to see her mother because she wanted to confront Mohammed and she was concerned for her mother, but her mother would not let her in the house. R.A. then called the police.

*Testimony for Defense.*

Several witnesses were called by Mohammed. A middle school attendance secretary was subpoenaed to bring attendance records for A.A., and was asked specifically about January 25, 2012. (We note this would pertain to A.A.'s reporting of the incident occurring the day of her 14th birthday party.) On January 25, A.A. was tardy for her first class of the day, but was in school until the end of the school day at 2:58 p.m. An instructional coordinator at a high school in Lincoln was also subpoenaed to bring attendance records and "collaborative plans" for A.A. and F.A. for "last year and this year." The coordinator met with A.A. and F.A., along with their mother and an interpreter, on November 5, 2015, to address attendance matters. (We note this would have been shortly after the police were contacted on October 31.) The coordinator answered, "No," when asked if either A.A. or F.A. indicated being a victim of sexual abuse or physical abuse; however, the coordinator also indicated he did not ask them if they were victims of sexual or physical abuse at that meeting. The coordinator was not aware of whether the girls were living with their mother at the time of the meeting, but said that he had since seen improvement in their attendance.

Mohammed's older sister (age 53) also testified. When she first moved to Lincoln on January 23, 2012, she stayed at Mohammed's house for "[m]ore than two weeks," after which she moved to an apartment. The older sister remembered celebrating A.A.'s birthday at that time, and claimed she and her sons never left the house that day. She claimed A.A. came home from school, took a shower, and came out and had "a pajama and a t-shirt on." When A.A. went upstairs to get

dressed, the sister said a "female friend" went upstairs with her. The sister did not see Mohammed go upstairs; "we both sat on the couch and we were talking and laughing because it's been years that I haven't seen him." When A.A. came back downstairs, she did not seem upset "at all."

The older sister's son, thus Mohammed's nephew, age 29, also testified. He also discussed A.A.'s birthday in January 2012; he was "playing Playstation" that day in the living room. He said A.A. was happy during the birthday party, and "[n]ot at all" upset. The nephew also talked about a time in 2014 when Mohammed and his wife were separated, and A.A. wanted them to stay together and "was doing her best to make things work out."

S.A.'s sister-in-law (married to the brother of S.A.'s husband) talked about the evening of October 31, 2015, saying there were many "things around me that was happening that was not right and that was not true." The sister-in-law "filed a complaint against" S.A. and told the police "that she is using false statements." After initially denying that she talked with Mohammed since his arrest, the sister-in-law then admitted he called her once to tell her to go and talk with his attorney. She subsequently had to acknowledge several other calls received from Mohammed, and said that since Mohammed's arrest, "me and my husband would've gone and helped him in any way we could."

After being reminded by the court, outside the presence of the jury, of his right to remain silent and not testify, Mohammed, age 44 at trial, testified in his own defense. He denied ever raping the two older stepdaughters, and he denied inappropriately touching any of his four stepdaughters. He also denied making any threats against his stepdaughters and denied physically abusing them.

*Jury Verdict and Sentencing.*

After deliberation, the jury returned a guilty verdict as to both counts on February 13, 2017. A sentencing hearing took place on April 26. Mohammed was sentenced to 3 to 5 years' imprisonment for Count 1, and 3 to 5 years' imprisonment for Count 2, with the sentences to be served consecutively. Mohammed now appeals.

## ASSIGNMENTS OF ERROR

Mohammed assigns the court erred by admitting testimony of prior sexual assaults under rule 414 and admitting evidence of prior physical assaults and other bad acts under rule 404. Mohammed also claims there was insufficient evidence to support the convictions and the court imposed excessive sentences.

## STANDARD OF REVIEW

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Hill*, 298 Neb. 675, 905 N.W.2d 668 (2018).

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate

court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Wofford*, 298 Neb. 412, 904 N.W.2d 649 (2017). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Dyer*, 298 Neb. 82, 902 N.W.2d 687 (2017).

ANALYSIS

*Testimony of Prior Sexual Assaults.*

Mohammed asserts the district court erred by allowing any testimony regarding prior sexual assaults for which Mohammed was not charged. The admissibility of evidence of prior sexual assaults is governed by rule 414, which reads in relevant part:

(1) In a criminal case in which the accused is accused of an offense of sexual assault, evidence of the accused's commission of another offense or offenses of sexual assault is admissible if there is clear and convincing evidence otherwise admissible under the Nebraska Evidence Rules that the accused committed the other offense or offenses. If admissible, such evidence may be considered for its bearing on any matter to which it is relevant.

. . . .

(3) Before admitting evidence of the accused's commission of another offense or offenses of sexual assault under this section, the court shall conduct a hearing outside the presence of any jury. At the hearing, the rules of evidence shall apply and the court shall apply a section 27-403 balancing and admit the evidence unless the risk of prejudice substantially outweighs the probative value of the evidence. In assessing the balancing, the court may consider any relevant factor such as (a) the probability that the other offense occurred, (b) the proximity in time and intervening circumstances of the other offenses, and (c) the similarity of the other acts to the crime charged.

(4) This section shall not be construed to limit the admission or consideration of evidence under any other section of the Nebraska Evidence Rules.

Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *State v. Payne-McCoy*, 284 Neb. 302, 818 N.W.2d 608 (2012).

Mohammed argues the State failed to show by clear and convincing evidence that Mohammed had committed the uncharged sexual assaults under rule 414(1). He asserts that the testimony of his stepdaughters about the assaults was too vague because it lacked details as to the dates and circumstances of the incidents. He also argues that even if the testimony was properly admitted under rule 414(1), the probative value was substantially outweighed by its prejudice under rule 414(3). He contends the remoteness in time between the other sexual assaults and the sexual assaults for which he was charged weighs in favor of not admitting the evidence. We disagree, as explained next.

In its order following the rule 414 and rule 404 hearing, the district court found the testimony of each of the stepdaughters credible, and that the sexual assaults they testified to demonstrated a "distinct similarity." The court noted the victims were all stepdaughters, "living in the home, and in vulnerable circumstances by being alone with the defendant when the events happened," and that Mohammed had used similar threats to keep them from disclosing the assaults. The district court found:

> [Mohammed] threatened either to claim that they were impure or threatened to kick them out of his house to fend for themselves, or did both. Culturally, the risks of either of these threats could result in each . . . [girl's] life being placed in jeopardy. Additionally, the threat of kicking them out of the house was not an idle one as he had done this to their older sister. There has clearly been a delay in the reporting of the sexual assaults by all of the witnesses. Some of the events testified to occurred 10 to 12 years ago.

Citing to *State v. Valverde*, 286 Neb. 280, 835 N.W.2d 732 (2013), the district court noted that remoteness is just one factor to be considered. In *Valverde*, the Nebraska Supreme Court stated, "The admissibility of evidence concerning other conduct must be determined upon the facts of each case, and no exact limitation of time can be fixed as to when other conduct tending to prove intent to commit the offense charged is too remote." *Id*. at 295, 835 N.W.2d at 744. In considering the Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016) balancing under rule 414, *Valverde* said "[r]emoteness is just one factor" in that balancing, and "the pattern of generational assaults within the same family at similar ages" weighed heavily against the defendant in that case. *Id*. at 295-96, 835 N.W.2d at 744. In the present matter, the district court likewise found that "the similarities of age in the victims, relationship to [Mohammed], and location of the assaults weighs heavily such that any remoteness argument in this case is negated."

Also, to the extent Mohammed suggests the evidence was not clear and convincing because of some confusion with regard to exact dates of particular acts, we note that the Nebraska Supreme Court has specifically found that the time and date of the sexual assault is not an element of sexual assault of a child, which "recognizes and accommodates the unique circumstances surrounding young victims, who 'are often unsure of the date on which the assault or assaults occurred and may have no meaningful reference point of time or detail by which to distinguish one specific act from another.'" *State v. Samayoa*, 292 Neb. 334, 343, 873 N.W.2d 449, 456 (2015), quoting *State v. Martinez*, 250 Neb. 597, 550 N.W.2d 665 (1996).

Finally, Mohammed argues that the jury was confused and misled because "the State presented the evidence of the prior alleged sexual assaults before putting on any evidence of the charged offenses." Brief for appellant at 33. He argues this had a "smoke and mirrors effect" leading the jury to focus more on the uncharged assaults than on the evidence of the charged assaults. *Id.* However, as pointed out by the State, Mohammed did not object to the order of the evidence at trial, and therefore cannot complain about it on appeal. We nevertheless note that Mohammed's reliance on the procedure used in *Valverde, supra*, is misplaced. In *Valverde*, the State did not provide the testimony of the victims as to the charged sexual assaults at the rule 414 hearings prior to trial. Therefore, the trial court in that case stated it would not make a final ruling on the ultimate admissibility of the evidence of the prior sexual assaults until it heard the testimony regarding the charged events at trial. The Nebraska Supreme Court noted the procedures used by

the trial court "prevented the jury from hearing potentially inadmissible evidence of prior sexual assaults until the court made its final ruling on admissibility." *Valverde*, 286 Neb. at 294, 835 N.W.2d at 743.

However, unlike the circumstances in *Valverde*, the victims in this case did testify at the rule 414 hearing as to the charged offenses, and the court did not give any indication that its ruling was only preliminary and dependent on the testimony regarding the charged offenses at trial. The procedure used by the trial court in *Valverde* is therefore not applicable to this case because the risk of the jury hearing potentially inadmissible evidence was not present.

We cannot say the risk of prejudice substantially outweighed the probative value of this evidence. The district court properly weighed the probability that the other offenses occurred, considered the issue of remoteness in time, but ultimately concluded a "distinct similarity" of the acts, including that the victims were all Mohammed's stepdaughters, "living in the home, and in vulnerable circumstances by being alone with the defendant when the events happened," and that Mohammed had used similar threats to keep them from disclosing the assaults. The district court did not abuse its discretion in admitting this evidence.

*Testimony of Prior Physical Assaults and Other Bad Acts.*

Mohammed claims the district court erred by allowing A.A. and F.A. to testify regarding specific instances of physical assaults and other bad acts. On this issue, the district court concluded as follows:

> The witnesses also testified during the hearing that [Mohammed] has subjected them to threats and physical abuse. The court finds that all of this evidence is inextricably intertwined with the evidence of sexual abuse such that it does not fall within the parameters of [rule 404]. Such evidence bears directly on the issue of the delayed reporting of the sexual abuse by each of the witnesses that testified. It also goes to the issue of similarity at the core of the [rule 414] analysis and is admissible.
>
> Even if the court were to find that the evidence of threats and other physical violence testified to by the witnesses was evidence of "other crimes, wrongs, or acts" as provided in [rule 404], the court finds that evidence would be wholly relevant to prove the defendant's motive, plan, intent, preparation, knowledge, and absence of mistake. Further, the probative value of such evidence when considered under the balancing test of [rule 403] would not be outweighed by any unfair prejudice. Therefore, even under a [rule 404] analysis, this evidence would be admissible.
>
> Accordingly, . . . the court finds that all of the evidence of other sexual assaults as testified to by [the four sisters] are admissible evidence under [rule 414] as to the crimes charged in the Information. Further, the other evidence of threats and physical violence is also admissible as it is inextricably intertwined with the evidence of sexual abuse. Even if it could be found that it is not inextricably intertwined, it is still admissible under [rule 404] as evidence to prove [Mohammed's] motive, plan, intent, preparation, knowledge, and absence of mistake.

We begin with Mohammed's argument that the testimony regarding his attempt to view F.A. in the shower, and A.A.'s testimony that Mohammed would frequently ask her to have sex

with him were not inextricably intertwined evidence and therefore would have been governed by rule 404. We disagree. In *State v. Baker*, 280 Neb. 752, 789 N.W.2d 702 (2010), a case involving the sexual assault of a child, the Nebraska Supreme Court discussed evidence that is inextricably intertwined with the charged offenses. The court stated, "Bad acts that form the factual setting of the crime in issue or that form an integral part of the crime charged are not part of the coverage under rule 404(2)." *Baker*, 280 Neb. at 760, 789 N.W.2d at 709.

In *Baker*, the court found "the mother's testimony regarding the first time she observed [the defendant] become sexually aroused while watching [her daughter] administer a massage" was "'part of the whole story'" and therefore not governed by rule 404(2) because it was "within the 'coherent picture of the facts of the crimes charged.'" 280 Neb. at 760, 789 N.W.2d at 709-10, quoting *State v. McPherson*, 266 Neb. 734, 668 N.W.2d 504 (2003). Likewise in the case before us, Mohammed's insistence that F.A. let him in the bathroom while she was showering and his subsequent attempt to view F.A. in the shower, and his attempts to convince A.A. to have sex with him, are part of their whole story of sexual abuse by Mohammed, and fall within the coherent picture of the facts of the crimes charged. The same can be said of the evidence related to threats made by Mohammed to his stepdaughters regarding telling anyone about his sexual assault of them. The district court did not abuse its discretion by allowing this evidence on the basis that it was inextricably intertwined with the evidence of sexual abuse.

We now address Mohammed's argument that the two specific instances of physical abuse, F.A.'s testimony that Mohammed punched her in the nose after she refused to reread some mail out loud to him, and the testimony from A.A. regarding Mohammed striking both A.A. and F.A. after they woke him up to ask for a ride to school, should not have been admitted under rule 414, nor is the evidence inextricably intertwined with the charged offenses. He argues this evidence is "wholly unrelated to the alleged sexual assaults." Brief for appellant at 36. Notably, the district court included in its order that to the extent the evidence might not be found to be inextricably intertwined, it was nevertheless admissible under rule 404. Mohammed argues, however, that this evidence was not admissible under rule 404 because there was no valid purpose for which it could have been offered. The district court found to the contrary, and we agree, that to the extent the evidence cannot be characterized as inextricably intertwined with the "whole story" of the charged offenses, it nevertheless bears directly on the issue of delayed reporting of the sexual abuse by A.A. and F.A. This purpose was clearly identified in the district court's pretrial order.

Evidence that is offered for a proper purpose is often referred to as having special or independent relevance, which means that its relevance does not depend upon its tendency to show propensity. *Baker, supra*. Rule 404(2) prohibits the admission of other bad acts evidence for the purpose of demonstrating a person's propensity to act in a certain manner. *Baker, supra*. Rule 404(2) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Mohammed argues that none of the purposes set forth in the statute properly apply here. An appellate court's analysis under rule 404(2) considers (1) whether the evidence was relevant

for some purpose other than to prove the character of a person to show that he or she acted in conformity therewith; (2) whether the probative value of the evidence is substantially outweighed by its potential for unfair prejudice; and (3) whether the trial court, if requested, instructed the jury to consider the evidence only for the limited purpose for which it was admitted. *Baker, supra*. It is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under rule 403 and rule 404(2), and the trial court's decision will not be reversed absent an abuse of discretion. See *Baker, supra*.

In *Baker, supra*, after finding some of the evidence of the defendant's past behavior was inextricably intertwined with the charged offenses and not subject to rule 404(2), the Supreme Court found that the testimony of the victim and her mother regarding threats and domestic violence did constitute rule 404(2) evidence. The evidence subject to rule 404(2) in *Baker* included the defendant grabbing the victim and squeezing her arms so hard he left indentations. Also, the victim's mother testified the defendant was physically abusive to her throughout the time they lived together, including choking and striking her with his fist, which resulted in black eyes on multiple occasions. The State offered this evidence to show that the victim and her mother feared the defendant, to show their fear was real and to explain their failure to make a prompt complaint. The district court in *Baker* ruled that the evidence would be received solely for explaining the delay in reporting the crimes, and so instructed the jury.

The Supreme Court in *Baker* noted that it had upheld the admissibility of rule 404(2) evidence on similar grounds in past cases. See, for example, *State v. Hitt*, 207 Neb. 746, 301 N.W.2d 96 (1981) (evidence that defendant struck child sexual assault victim with paddle and hit younger sibling on knees with hammer was properly received to establish children were genuinely afraid of defendant, thereby explaining their failure to make prompt complaint). *Baker* distinguished cases where evidence of prior physical abuse or uncharged sexual assaults upon other females was improperly admitted to prove the defendant's propensity to commit the crimes charged, pointing out that in *Baker*, the defendant's prior acts were offered and received for the limited purpose of explaining a victim's delay in reporting a crime.

*Baker* concluded that the "district court did not abuse its discretion in determining [the defendant's] prior acts of domestic violence had independent relevance to show that [the victim] and her mother had a genuine and legitimate basis for believing that [the defendant] would carry out his threats to harm them if they reported the crimes and that the probative value of such evidence was not substantially outweighed by the danger of unfair prejudice or other factors enumerated in rule 403." 280 Neb. at 763, 789 N.W.2d at 711.

We find the same to be true in the present case. As in *Baker*, we conclude the evidence of delayed reporting of sexual abuse based on prior acts of physical abuse has independent relevance and is admissible under rule 404. As found by the district court in this case, such evidence bears directly on the issue of the delayed reporting of the sexual abuse by each of the witnesses who testified and had independent relevance for that purpose. Although Mohammed does not specifically argue that the probative value of the evidence was substantially outweighed by its potential for unfair prejudice, we nevertheless find no abuse of discretion by the district court in its balancing of this factor. Finally, as the State notes, there is nothing in the record indicating a limiting instruction was requested with regard to this evidence, and therefore we cannot find error with the court for failing to provide a limiting instruction as to the independent purpose of this

evidence. Further, even without a limiting instruction, the admission of this evidence was harmless when considered against the sisters' testimonies regarding the sexual abuses and threats they were subjected to by Mohammed. The district court did not abuse its discretion in admitting evidence of past physical abuse.

*Sufficiency of Evidence to Support Convictions.*

Mohammed asserts there was insufficient evidence to support his convictions. Mohammed was convicted of two counts of third degree sexual assault of a child under Neb. Rev. Stat. § 28-320.01 (Reissue 2016), which states in relevant part:

> (1) A person commits sexual assault of a child in the second or third degree if he or she subjects another person fourteen years of age or younger to sexual contact and the actor is at least nineteen years of age or older.
>
> . . . .
>
> (3) Sexual assault of a child is in the third degree if the actor does not cause serious personal injury to the victim. Sexual assault of a child in the third degree is a Class IIIA felony for the first offense.

> Sexual contact is defined under Neb. Rev. Stat. § 28-318(5) (Reissue 2016) as
> the intentional touching of the victim's sexual or intimate parts or the intentional touching of the victim's clothing covering the immediate area of the victim's sexual or intimate parts. Sexual contact shall also mean the touching by the victim of the actor's sexual or intimate parts or the clothing covering the immediate area of the actor's sexual or intimate parts when such touching is intentionally caused by the actor. Sexual contact shall include only such conduct which can be reasonably construed as being for the purpose of sexual arousal or gratification of either party. Sexual contact shall also include the touching of a child with the actor's sexual or intimate parts on any part of the child's body for purposes of sexual assault of a child under sections 28-319.01 and 28-320.01.

"Intimate parts means the genital area, groin, inner thighs, buttocks, or breasts." § 28-318(2).

Count 1 arose from Mohammed's sexual contact with A.A. Mohammed was 44 years old at trial in February 2017. Along with other testimony, A.A. testified that somewhere around January 25, 2012, when she was celebrating her 14th birthday, she was in her room in Lincoln when Mohammed came in after she showered, grabbed her and caused her towel to fall off, and touched her breast with his hand. He told her how she was "growing up" and how she "looked so cute."

Count 2 arose from Mohammed's sexual contact with F.A. Along with other testimony, F.A. testified about an incident in Lincoln when she was between the ages of 10 and 11. Mohammed called her to his bedroom to read an email to him while he was lying on the bed. F.A. was standing next to him reading the email when Mohammed started touching her back and began touching her chest. He then pulled her onto the bed, held her down, and took off her shirt. He touched her chest with both the shirt on and off, and he eventually touched her vagina.

In each of the counts described, Mohammed was over the age of 19, the victims were age 14 or less at the time of the sexual contact, and the sexual contact did not cause serious personal injury to the victims. All elements of third degree sexual assault were satisfied.

Mohammed claims, however, that there were several inconsistencies in the testimony of both A.A. and F.A. as to these events, and argues no reasonable finder of fact could have found the elements of § 28-320.01 were met based on those inconsistencies. However, in reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. *State v. Hill*, 298 Neb. 675, 905 N.W.2d 668 (2018). Accordingly, we find that when viewed and construed most favorably to the State, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt to support both convictions.

*Excessive Sentences.*

Mohammed assigns the district court erred by sentencing him to 3 to 5 years' imprisonment for Count 1, and 3 to 5 years' imprisonment for Count 2, to be served consecutively, instead of probation or a lesser term of incarceration. Mohammed was convicted of two counts of third degree sexual assault of a child under § 28-320.01(3) which is a Class IIIA felony. Because he was convicted for offenses committed prior to August 30, 2015, the "changes made to the penalties for Class III, IIIA, and IV felonies by Laws 2015, LB605, do not apply[.]" Neb. Rev. Stat. § 28-105(8) (Reissue 2016). Instead, under Neb. Rev. Stat. § 28-105 (Cum. Supp. 2014), a Class IIIA felony has a maximum of 5 years' imprisonment, or $10,000 fine, or both, with no minimum imprisonment. Mohammed's sentences were therefore within the statutory limits.

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Stone*, 298 Neb. 53, 902 N.W.2d 197 (2017). When imposing a sentence, the sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the violence involved in the commission of the offense. *Id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *State v. Chacon*, 296 Neb. 203, 894 N.W.2d 238 (2017). A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *State v. Dyer*, 298 Neb. 82, 902 N.W.2d 687 (2017).

Mohammed's presentence investigation report included a "Level of Service/Case Management Inventory" to "determine the degree of risk that [he] presents to the community and risk to recidivate." The presentence investigation report reveals that Mohammed has no criminal record and has a sixth grade education. He scored as a "low risk" to reoffend on the Level of Service/Case Management Inventory, but scored as a "high risk" in the "Procriminal Attitude/Orientation" category based on his refusal to take any responsibility for the crimes he committed. Mohammed refused to participate in the specific assessment for sex-related offenses,

- 14 -

despite being informed several times of the importance of this assessment for the sentencing court. The assessment is used by the Nebraska Probation System to determine the appropriateness of community supervision for a defendant convicted of a sex offense.

Mohammed's counsel argued at the sentencing hearing that "[j]ust because [Mohammed] maintains his innocence does not mean that he can not follow a term of probation." Counsel pointed out that while Mohammed has been in jail, he has been involved in programming there, including Lincoln Literacy. Mohammed has conformed with the rules of the jail, but for "one minor write-up" related to him "making a notebook out of some pieces of paper." Mohammed's counsel argued that prior to his arrest, Mohammed was generally employed and was a low risk to reoffend. He asked for time served in jail and to be placed on probation. The State asked for the maximum sentence of 5 years on each count.

At the sentencing hearing, the district court observed that Mohammed engaged in a pattern of behavior "that went unchecked for a very long time and caused great harm. It is a violation of trust at the highest level. And certainly not the type of conduct that a probationary sentence would be appropriate for." Accordingly, the court found that "imprisonment is necessary to protect the public, which certainly includes the named victims and family members of [Mohammed]." The court further stated that lesser sentences would depreciate the seriousness of these crimes and promote disrespect for the law. The court also found the serious and long-lasting harm Mohammed caused was a substantial and compelling reason not to place Mohammed on probation. "And through [Mohammed's] words and conduct, specifically, his denial of all responsibility, the Court could not imagine that he would follow the orders of the Court, much less what he has already done in terms of violating the law and the rules of society."

Mohammed argues on appeal that his "sentence of imprisonment exceeded the minimum period consistent with the protection of the public, the gravity of the offense, and the rehabilitation needs of [Mohammed]." Brief for appellant at 49.

Sexual advances and assaults on minor children are serious offenses. See *State v. Patrick*, 227 Neb. 498, 418 N.W.2d 253 (1988). Mohammed engaged in a pattern of sexually assaulting his stepdaughters, and used various threats to keep them silent. As the district court aptly expressed, Mohammed's actions were a "violation of trust at the highest level." The district court did not abuse its discussion in the sentences ordered.

## CONCLUSION

For the reasons set forth above, we affirm Mohammed's convictions and sentences.

AFFIRMED.